ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs,

Department of Natural Resources and Conservation, State of Montana, Plaintiff in Intervention,

v.

Rogers C. B. MORTON, Secretary of the United States Department of the Interior, et al., Defendants,

American Metal Climax, Inc., et al., Defendants in Intervention,

Kerr McGee Corporation, Defendant in Intervention.

Civ. No. 1220.

United States District Court, D. Montana, Billings Division.

July 22, 1976.

George W. Pring, Laurence Edelman, Denver, Colo., James F. Goetz, Bozeman, Mont., for EDF.

John D. Leshy, Palo Alto, Cal., for NRDC.

Theodore J. Doney, Allen B. Chronister, Dept. of Natural Resources and Conservation, State of Montana, Helena, Mont., for plaintiff in intervention.

Keith L. Burrowes (then U. S. Atty.), Asst. U. S. Atty., Billings, Mont., for defendants.

Edward W. Clyde, Clyde, Mecham & Pratt, Salt Lake City, Utah, Cale Crowley, Crowley, Haughey, Hanson, Gallagher & Toole, Billings, Mont., for defendants in intervention.

Peter J. Nickles, Robert E. Lighthizer, Covington & Burling, Washington, D. C., Bruce L. Ennis, Moulton, Bellingham, Longo & Mather, Billings, Mont., for defendant in intervention.

## OPINION

BATTIN, District Judge.

This is a suit for injunctive and declaratory relief to restrain defendants from undertaking any activities in connection with the contracting, sale, or disposition of water for industrial purposes from the Yellowtail and Boysen Reservoirs located in Montana and Wyoming.

The amended complaint presents eight claims for relief.

## FIRST CLAIM FOR RELIEF

Plaintiffs argue that the United States Congress authorized the construction and operation of Yellowtail and Boysen Reservoirs for the exclusive purposes of providing water for agricultural irrigation, hydroelectric power, flood and silt control, and supplementation of stream flow, but there is no authorization for use of waters from these reservoirs for industrial purposes. The plaintiffs contend that defendants have failed to fulfill this primary legislative purpose because massive amounts of water under the water option contracts have been diverted away from Congressionally intended agricultural purposes, for use by private industry in violation of the Flood Control Act of 1944, 58 Stat. 887, and the Reclamation Act of 1902, 43 U.S.C. § 391, et seq., as amended.

### 1. *INTRODUCTION*

██ The particular provisions of the Reclamation Act of 1902 (32 Stat. 388, 43 U.S.C. 391, *et seq.*) relied upon by plaintiffs are not applicable to the industrial water option contracts. Furthermore, the Flood Control Act of 1944 (58 Stat. 887, 33 U.S.C. § 701–1, *et seq.*) authorizes use of project water for industrial purposes and also expressly authorizes the marketing thereof under federal reclamation law. The Court also concludes that the Bureau of Reclamation and Secretary of the Interior legally proceeded to process, approve and execute the water option contracts pursuant to the authority contained in Section 9(c) of the Reclamation Project Act of 1939 (53 Stat. 1194, 43 U.S.C. § 485h(c)).

### 2. *DISCUSSION*

#### a. *Industrial Use.*

In 1944, Congress authorized development of the Missouri River Basin in a comprehensive plan that contemplated multipurpose use of water resources. Prompted by flood damage and the need for a controlled water supply on the Missouri River and its tributaries, the Corps of Engineers and the Bureau of Reclamation undertook

studies to determine the most feasible means of development of the region's water resources. The Corps of Engineers' report was prepared by Colonel Lewis A. Pick and was formalized in Congress as House of Representatives Document No. 475, 78th Congress, Second Session (1944); and the Bureau report undertaken pursuant to Section 9 of the Act of August 4, 1939 (43 U.S.C. § 485h), was prepared by W. G. Sloan and was formalized in Congress as Senate Document No. 191, 78th Congress, Second Session (1944). These two plans were reconciled in Senate Document No. 247, 78th Congress, Second Session (1944), and became popularly known as the Pick-Sloan Plan for the development of the Missouri River Basin. Both plans were approved and authorized by Congress in Section 9 of the Flood Control Act of 1944, 58 Stat. 891.

The plans contemplated industrial use of the water supply. The Sloan Plan (S.Doc. No. 191) recognized that agriculture was at that time "the primary basis of the economy of the Missouri River Basin." The document also explained that all beneficial uses of water could be accommodated, and emphasized that the plan would develop in stages with sufficient flexibility to meet unforeseen changes in the physical and economic conditions of the area. (S.Doc. No. 191 at 17.) Along with other multipurpose objectives, industrial use of water would be a project purpose:

> In our opinion, the report presents a plan which, if carried out, would adequately meet these objectives. It is a comprehensive plan for the highest beneficial use of the waters of the basin. It provides for flood control, navigation, irrigation, power development, domestic and industrial water supplies, silt control, recreational use of waters, conservation of fish and wildlife and pollution abatement, and will assist in the restoration and maintenance of the ground water levels and inland lakes. (S.Doc. No. 191 at 10.)

The plan also provided:

> To the extent that the several functions of water control and utilization are con-flicting, preference should be given to those which make the greatest contribution to the well-being of the people and to the areas of greatest need. To the extent that the uses of water are competitive, the use of water for domestic, agricultural and industrial purposes should have preference. The plan would meet these objectives. (S.Doc. No. 191 at 10.)

The Congressional debate also indicated an awareness by Congress that industrial water supplies would be developed through the proposed projects, and that unforeseen future events might dictate substantial industrial use. (See 90 Cong.Rec., pt. 3, 4119 *et seq.* (daily ed. May 8, 1944).)

As the result of the Pick and Sloan plans, and Congressional debate, Congress provided in Section 1(b) of the Flood Control Act of 1944:

> The use for navigation, in connection with the operation and maintenance of such works herein authorized for construction, of waters arising in States lying wholly or partly west of the ninety-eighth meridian shall be only such use as does not conflict with any beneficial consumptive use, present or future, in States lying wholly or partly west of the ninety-eighth meridian, of such waters for domestic, municipal, stock water, irrigation, mining, or industrial purposes.

The Boysen and Yellowtail Units were both planned to satisfy the spectrum of beneficial uses of the water resource as contemplated by the authorizing legislation. For example, the Definite Plan Report for the Yellowtail Unit explains:

> The proposed Yellowtail Unit is a multi-purpose development planned to provide irrigation, flood control, power generation, silt retention, improvement of fish and wildlife resources, recreational opportunities, municipal-industrial water and other benefits (Definite Plan Report, Yellowtail Unit—Montana, Volume I, Page 1, Department of Interior 1950).

### b. *Judicial Confirmation.*

The Federal District Court in Montana has consistently recognized the multiple-

purpose features of reclamation facilities constructed as part of the Upper Missouri River Basin Program. In *United States v. 5,677.94 Acres of Land, et al.,* 152 F.Supp. 861, 862 (D.C.Mont.1957), Judge Pray recognized that the Yellowtail Unit was:

. . . designed to accomplish the several public uses stated, such as helping avert and control flood waters, generate electric power, control silt and abate water pollution, provide recreational areas, make water available for irrigation, and for municipal and industrial uses.

Two years later, in *United States v. 5,677.94 Acres of Land, et al.,* 162 F.Supp. 108, 120 (D.C.Mont.1958), Judge Jameson similarly noted that the Yellowtail Dam would:

. . . be a multi-purpose dam, making water available for irrigation, power, municipal and industrial purposes, recreation, and flood control and river regulations.

Further, in *Crow Tribe v. United States,* Civil No. 214 (D.C.Mont.1961) (October 6, 1963, at page 37), Judge Jameson observed, as a basis for the award to the Crow Tribe, that the United States:

. . . is constructing a multipurpose dam designed to "provide irrigation, flood control, power generation, silt retention, improvement of fish and wildlife resources, recreational opportunities, municipal-industrial water and other benefits."

A similar observation was made by Judge Murray in *United States v. 361.91 Acres of Land, et al.,* Civil No. 994 (D.Mont.1965) (April 10, 1965), where he rejected the argument that Clark Canyon Dam (a project also authorized as part of the Sloan Plan under Section 9 of the Flood Control Act of 1944) was intended by Congress to serve only irrigation and flood control purposes, and declared:

The lands in Parcel No. 12 were taken for use in connection with the Clark Canyon Dam and Reservoir, East Bench Unit, Missouri River Basin Project. The Missouri River Basin Project was authorized by Section 9 of the Flood Control Act of December 22, 1944 (58 Stat. 887), and

Section 18 of the Flood Control Act of July 24, 1946 (60 Stat. 641). Section 9(a) of the Flood Control Act of December 22, 1944, approved the general comprehensive plans for the development of the Missouri River Basin set forth in Senate Document 191, and House Document 475, 78th Congress, Second Session. The Clark Canyon Dam and Reservoir is included in the comprehensive plan for the development of the Missouri River Basin on page 62 of Senate Document 191. Senate Document 191, at page 13, indicates that considerations for the protection of fish and wildlife and for recreation were included in the overall plan for the development of the Missouri River Basin, as well as flood control, irrigation and power. (Order dated April 10, 1965, at page 3.)

Judge Murray noted that page 13 of S.Doc. No. 191 provided for multiple purpose objectives for the projects therein identified; that the very same page of S.Doc. No. 191 also included industrial use within project purposes, and declared, "In the future there will also be greater requirement for industrial water supplies."

c. *Secretarial Authorization to Sell Industrial Water.*

Section 9(c) of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(c), authorizes the Secretary of the Interior to enter into contracts to supply project water for "municipal water supply or miscellaneous purposes."

In many instances, industrial water use would qualify both as a "municipal" and "miscellaneous" water use. Municipal and industrial uses are closely associated with each other and are sometimes grouped into a single use designated as "M&I" use. Congress has also made express declarations that municipal use includes industrial use; illustrated, for example, is the Act of February 25, 1956, 70 Stat. 29, 43 U.S.C. § 615a (Washita Project), where it is provided that:

Allocations to municipal water supply, including domestic, manufacturing, and in-

dustrial uses, shall be repayable through contracts with municipal corporations, or other organizations as defined by section 2, Reclamation Project Act of 1939 (53 Stat. 1187).

The Water Supply Act of 1958 further confirms the Congressional intent of the 1939 Act authorizing the sale of industrial water. Section 301 of the 1958 Act (43 U.S.C. § 390b) authorizes the Secretary to impound and store water in reclamation project facilities "for present or anticipated future demand or need for municipal or industrial water." And Section 301(b) of the same Act expressly declares that such authority "shall be an alternative to and not a substitute for the provisions of the Reclamation Project Act of 1939 (53 Stat. 1087) relating to the same project."

The clearest Congressional declaration came in the Act of June 21, 1963, 77 Stat. 68, wherein Congress expressly authorized the renewal of contracts previously made by the Secretary under authority of the Reclamation Project Act of 1939 for "municipal, domestic or industrial" purposes.

Furthermore, Congress has been made aware of the Secretary's actions in selling the reclamation project water for industrial use under the authority of the 1939 Act and has not objected. See, for example, *Hearings on H.R. 14159 Before the Senate Comm. on Appropriations*, 91st Cong., 1st Sess., pt. 3, at 2788 (1969); *Hearings on Public Works Appropriations for 1972, Before the Senate Comm. on Appropriations*, 92nd Cong., 1st Sess., at 29 (1971); *Hearings on Yellowtail Dam Before the Subcomm. on Irrigation and Reclamation of the House Comm. on Interior and Insular Affairs*, 83rd Cong., 2d Sess., ser. 13 (1954).

In *361.91 Acres, supra* at page 3, Judge Murray observed that, because the Clark Canyon Dam and Reservoir were intended to serve multiple-purpose functions as described in S.Doc. No. 191, the Courts had "little or no" authority to interfere with the manner in which the Secretaries of the Interior and Defense, within their respective jurisdictions, discharged their administrative responsibilities:

The function of carrying out the overall plan for the development of the Missouri River Basin has been delegated by Congress to the Departments of Defense and Interior, and the Secretaries of those Departments have been vested with a wide discretion in carrying out such plan, and the courts have little or no authority to interfere with the exercise of that discretion.

For the foregoing reasons, the defendants' motion for summary judgment is granted.

### SECOND CLAIM FOR RELIEF

Plaintiffs allege that defendants have not obtained approval of the industrial water option contracts by the appropriate water users' associations; have failed to make the required showing that there is no other practicable source of water supply for these industrial purposes; and have contracted to furnish water for industrial purposes, the delivery of which will be detrimental to agricultural irrigation and the rights of prior appropriators; all in violation of 43 U.S.C. § 521.

Subsequently, plaintiffs moved that this claim for relief be dismissed without prejudice.

It is the Court's order that this claim be dismissed with prejudice. The Miscellaneous Water Supply Act of 1920 (41 Stat. 451, 43 U.S.C. § 521) has no application to the issues in this law suit.

Boysen and Yellowtail Projects were built as multi-purpose projects under the Flood Control Act of 1944, and the Bureau was authorized by the 1944 Act and the Reclamation Project Act of 1939 to enter into the subject contracts.

### THIRD CLAIM FOR RELIEF

Plaintiffs allege that the defendants in their water marketing program have modified the Yellowtail and Boysen Reservoirs project purposes to include storage for industrial water, and that such modification seriously changes the purpose for which

these projects were authorized and constructed. Plaintiffs further contend that defendants have failed to seek the required approval of Congress for such modifications and changes, in violation of 43 U.S.C. § 390b(d).

Plaintiffs have also requested to dismiss without prejudice this claim for relief.

■ Likewise, IT IS ORDERED that the claim is dismissed with prejudice. The Water Supply Act is a separate and distinct authorized procedure from that given by Congress in Section 9(c) of the Reclamation Project Act of 1939 under which statutory authority the Bureau of Reclamation and Secretary of the Interior proceeded in this case. As the Water Supply Act declares:

> The provisions of this subsection insofar as they relate to the Bureau of Reclamation and the Secretary of the Interior shall be alternative to and not a substitute for the provisions of the Reclamation Projects Act of 1939 (53 Stat. 1187) relating to the same subject. (43 U.S.C. § 390b(b).)

## FOURTH CLAIM FOR RELIEF

Plaintiffs allege that the defendants in their industrial water marketing program have made contracts relating to municipal water supply and miscellaneous purposes, including industrial purposes; and that the defendant Secretary has failed to make required judgment that such contracts will not impair the efficiency of the Yellowtail and Boysen projects for irrigation purposes, in violation of the Reclamation Project Act of 1939 (43 U.S.C. § 485h(c)).

### DISCUSSION

■ The defendants admit that under the water option contracts, water will be used for industrial purposes. Such activities and contracts were authorized by the Pick-Sloan Missouri Basin Program. Section 9(a), Flood Control Act of 1944. The Secretary is required by Section 9(c) of the Reclamation Project Act of 1939 (53 Stat. 1194, 43 U.S.C. § 485h(c)) to determine that the irrigation efficiency of a project will

not be impaired by industrial water sales before contracts are approved for such use.

■ The elements of judicial review of a Secretarial determination with respect to irrigation efficiency are those set forth by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). These elements are (1) whether the Secretarial action was within the scope of his authority; (2) whether his action was arbitrary, capricious, or an abuse of discretion; and (3) whether his action complies with the applicable procedural requirements.

### 1. Scope of Authority.

Because the Secretary is authorized to sell industrial water from the Boysen and Yellowtail Units by virtue of the Reclamation Project Act of 1939 and the Flood Control Act of 1944, then the Secretary acted within the scope of his authority in approving the water option contracts.

■ A more pertinent question is whether the Secretary acted within the scope of his authority in determining that the industrial water use would not impair the irrigation efficiency of the Boysen and Yellowtail Units. Here, there is no question as to the scope of the Secretary's authority because 43 U.S.C. § 485h(c) not only authorizes, but requires the Secretary to make such a determination.

### 2. Arbitrary, Capricious, or an Abuse of Discretion.

In this test on judicial review, the Court must determine whether the Secretary considered the relevant factors and whether he made a clear error of judgment.

#### a. Relevant Factors.

■ In determining whether industrial water use will impair the efficiency *of the project* for irrigation purposes, the only relevant factors are those which relate to the irrigation efficiency of *the project*—the statutory determination is expressly limited to impairment of Boysen and Yellowtail for irrigation purposes. The Secretary is not

concerned with the adequacy of the water supply for the irrigation of all lands in a river basin or the State of Montana.

The plaintiffs seek to convert the Secretarial determination concerning project efficiency into a NEPA-type balancing of all factors related to the use of water. This position is inconsistent with the express terms of the statute.

The plaintiffs essentially contend that the Secretary must consider the benefits of deferring industrial water use, whether industrial water use is in the public interest, whether preservation of the Big Horn River is a preferable course of action, what alternative choices are available to satisfy the future demands for energy, the environmental effect of industrial water use, the economic effect of industrial water use on the companies desiring to make such use and on their consumers, and harm likely to flow from the decision. Beyond this, the plaintiffs suggest that other factors cannot be determined unless and until an evidentiary hearing is held on the merits of the Secretary's decision to sell industrial water.

The Court cannot accept the plaintiffs' argument. The cases cited by the plaintiffs have nothing to do with the statute under which the Secretary determined that industrial water use in the amounts authorized would not impair project efficiency for irrigation purposes, and those cases in no way purport to establish any relevant factors for all administrative decisions made under all statutes. 43 U.S.C. § 485h(c) sets forth the sole consideration for the Secretary—whether industrial water use will impair the efficiency of the project for irrigation purposes. The statute is unambiguous and any interpretation that might be appropriate should be made as a matter of law in a summary judgment proceeding and not as an evidentiary matter.

The plaintiffs argue that the Secretary failed to take into account the central relevant factor: namely, whether there exist potentially irrigable lands in the basin which could be developed were the reclamation water not diverted to industry, but which will instead be adversely affected if not undevelopable in its absence.

This argument is specious. As the administrative record before the Court shows, the Secretary made an analysis of water supply and irrigation needs and concluded that the industrial water use would not impair project irrigation efficiency. Plaintiffs have filed affidavits from two experts, which state that they disagree with the conclusion reached by the Secretary. In essence, the plaintiffs' experts assert that, since they disagree with the Secretary with respect to the potential impairment of project irrigation efficiency, the Secretary must have failed to consider the full potential of irrigation development. But the legal test is simply whether the Secretary considered the relevant factors. He did, and the administrative record shows that he did.

The plaintiffs assert an overly broad view of the statutory requirement as to the potential irrigation development from the Yellowtail and Boysen project water. The statute does not encompass consideration of irrigation in other river basins or other projects.

#### b. *Clear Error of Judgment.*

The plaintiffs argue that this Court should determine whether the failure to consider any relevant factors resulted in a clear error of judgment. Since the Secretary considered the relevant factors required by 43 U.S.C. § 485h(c), there was no clear error of judgment.

### 3. *Procedural Requirements.*

The administrative record presented to the Court satisfies the requirement of *Citizens to Preserve Overton Park, supra,* and *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

The administrative record consists of thorough studies, reports, evaluations, memoranda, and correspondence which preceded the Secretarial action authorizing the sale of industrial water from the Boysen and Yellowtail Units. The Bureau of Reclamation assembled a base of information

concerning the water supply. The Commissioner of Reclamation in turn submitted a formal memorandum on four separate occasions to the Secretary of the Interior, explaining the reasons for the marketing of industrial water, the exact amount of water to be authorized for sale in each instance, and why other project functions would not be impaired if project water were marketed for industrial use in the amounts recommended. The Secretarial action in each instance was represented by the signed approval of the Assistant Secretary for Water and Power Development on the memorandum from the Commissioner, thus adopting that memorandum as the formal action document. Furthermore, the administrative record consists of documents prior to and contemporary with the Secretary's decision.

The administrative decisions contain an explanation and justification for the action taken. The relevant factors were considered and there was no clear error in judgment. Furthermore, there is no strong showing of bad faith or improper behavior by the Secretary.

Therefore, the defendants are entitled to summary judgment.

### FIFTH CLAIM FOR RELIEF

Plaintiffs allege that a substantial portion of the available flow of water in the Yellowstone River and tributaries has been contracted away by the actions of the defendants in executing the industrial water option contracts; that flows will be further substantially reduced by permitting the exercise of water option contracts and additional option contracts; that plaintiff water users and water users' associations, as well as all agricultural irrigators in the region, have property rights to irrigation water in the Yellowstone River and tributaries, in accordance with state, interstate, and federal law; that defendants have failed to determine present and future water needs for agricultural purposes in the region, prior to executing contracts for the sale of large quantities of said waters; that the contracts adversely affect and prejudice existing lawful users of Yellowstone River sys-

tem waters; in violation of the Flood Control Act of 1944, 58 Stat. 887, and the Act of 1920, 43 U.S.C. § 521; and finally, that the contracts constitute an appropriation and taking of such waters for purposes not authorized or sanctioned by Congress, in violation of the Fifth Amendment to the United States Constitution.

*DISCUSSION.*

The plaintiffs seem to present two interpretations of their complaint: (a) injury to existing rights and (b) a property right in having stored waters released to augment stream flow.

#### a. *Injury to Existing Rights.*

The plaintiffs have admitted in answers to interrogatories and in depositions that there has not been any interference, impairment, or injury to their water rights from the construction and operation of the Boysen and Yellowtail Units. The option contracts, by their express terms, only concern stored water. This stored water is not water to which plaintiffs are entitled under their appropriations. It is surplus and unappropriated water. The United States appropriated it by complying with the state laws of Montana and Wyoming and then it entered into these option contracts, which expressly provide for the sale of stored water. All of the purchasers of water under the option contracts have the same priority and that priority is the date of priority of the United States for the impounding of the waters in the Reservoirs. As a matter of law, if the plaintiffs' priorities are ahead of the United States', they will be honored. If they are later than the United States', they are subordinate.

 The plaintiffs' claim is premature for there is neither a real nor an immediate injury or threat of injury to their water rights. As stated in *Holiday Inns v. D & D Corp.,* 409 F.2d 614 (3rd Cir. 1969):

We must protect that which is protectable, but, in so doing, we must limit the use of injunctive relief to situations where it is necessary to prevent immedi-

ate and irreparable injury. The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing, actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law.

### b. Property Right.

■ Although it is not clearly pleaded in the complaint, the plaintiffs, who do not have a water contract and have not applied for one, asserted at oral argument that the Flood Control Act of 1944 was a statutory grant to them of a property right to have the stored waters released without a contract to augment the stream flow to provide the plaintiffs with supplemental irrigation water.

The plaintiffs' claim has no basis. First, there is no language in the Flood Control Act which could be construed as a grant of a property right to plaintiffs. Second, the reclamation statutes require the Secretary to enter into repayment contracts for the use of project water.[1] Third, to adopt the plaintiffs' position would be contrary to the intent of the excess land requirements of the Omnibus Adjustment Act of 1926 and fundamental reclamation law which requires repayment contracts for water. See *Ivanhoe Irrigation District v. McCracken*, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

Therefore, IT IS ORDERED that summary judgment is granted in favor of the defendants.

### SIXTH CLAIM FOR RELIEF

Plaintiffs allege that the industrial water marketing program and each water option contract constitute major federal actions significantly affecting the quality of the human environment, requiring the defendants to comply with the provisions of NEPA

### DISCUSSION.

■ Section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321, *et seq.*) requires an impact statement in every recommendation or report on proposals for legislation or other major federal action significantly affecting the quality of the human environment. Because there is no proposed legislation, the issue is whether there is a proposal for major federal action which requires an environmental impact statement (EIS). This Court concludes that there is no proposal for major federal action, and therefore an EIS is not required at this time.

The timing of an EIS was specifically addressed in *Kleppe v. Sierra Club*, —— U.S. ——, 96 S.Ct. 2718, 49 L.Ed.2d 576, 44 L.W. 5104 (1976). In that case, the "Court of Appeals, in reversing the District Court, did not find that there was a regional plan or program for development of the Northern Great Plains region. It accepted all of the District Court's findings of fact, but concluded nevertheless that the petitioners 'contemplated' a regional plan or program. The court thought that the North Central Power Study, the Montana-Wyoming Aqueducts Study, and the NGPRP [Northern Great Plains Resource Program] all constituted 'attempts to control development' by individual companies on a regional scale. It also concluded that the interim report of the NGPRP, then expected to be released at any time, would provide the petitioners with the information

---

1. For example, Section 46 of the Omnibus Adjustment Act of 1926 provided:

 No water shall be delivered upon the completion of any new project or new division of a project until a contract or contracts in form approved by the Secretary . . . shall have been made . . . for payment . . of the cost of constructing, operating and maintaining the works during the time they are in control of the United States, such cost of constructing to be repaid within such terms of years as the Secretary may find to be necessary, in any event not more than forty [40] years.

 This same general language appears in Section 9(d) of the Reclamation Project Act of 1939 (53 Stat. 1195, 15 U.S.C. § 721(f).)

needed to formulate the regional plan they had been 'contemplating.' The Court therefore remanded with instructions to the petitioners to inform the District Court of their role in the further development of the region within 30 days after the NGPRP interim report issued; if they decided to control that development, an impact statement would be required." (—— U.S. page ——, 96 S.Ct. page 2727, page 5107.)

The Supreme Court rejected that position. The Court concluded that there was no evidence in the record of any proposal for major federal action with respect to the Northern Great Plains Region, but rather it appeared that all proposals had been for actions of either local or national scope. The Court also noted that Section 102(2)(C) of NEPA clearly states that an EIS is not required until an agency makes a recommendation or report on a proposal for major federal action. *Aberdeen & Rockfish Railroad v. SCRAP*, 422 U.S. 289, 320, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); *Kleppe, supra*, —— U.S., at ——, 96 S.Ct., at 2728, at 5108. The Supreme Court also admonished that the "Court has no authority to depart from the statutory language and, by a balancing of court-devised factors, determine a point during the germination process of a potential proposal at which an impact statement *should be prepared.*" *Kleppe, supra*, —— U.S., at ——, 96 S.Ct., at 2729, at 5108 (original emphasis).

In reviewing the Congressional intent of NEPA, the Supreme Court stated:

The legislative history of NEPA fully supports our reading of § 102(2)(C) as to when an impact statement is required. The bill passed by the House contained no provision comparable to § 102(2)(C) of the Act. The bill that was reported to and, as amended, passed by the Senate did contain the forerunner of § 102(2)(C). The committee report made clear that the impact statement was required in conjunction with *specific proposals for action.* S.Rep. No. 91–926, 91st Cong., 1st Sess., 20 (July 9, 1969). Emphasis added. *Kleppe, supra*, —— U.S., at ——, 96 S.Ct., at 2726, at page 5107, footnote 12.

In ruling that NEPA requires a specific proposal, the Supreme Court stated:

Quite apart from the fact that the statutory language requires an impact statement only in the event of a proposed action, respondents' desire for a regional environmental impact statement cannot be met for practical reasons. In the absence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement. Section 102(2)(C) requires that an impact statement contain, in essence a detailed statement of the expected adverse environmental consequences of an action, the resource commitments involved in it, and the alternatives to it. Absent an overall plan for regional development, it is impossible to predict the level of coal-related activity that will occur in respondents' region, and thus impossible to analyze the environmental consequences and the resource commitments involved in, and the alternatives to, such activity. A regional plan would define fairly precisely the scope and limits of the proposed development of the region. Where no such plan exists, any attempt to produce an impact statement would be little more than a study along the lines of the NGPRP [Northern Great Plains Resources Program], containing estimates of potential development and attendant environmental consequences. There would be no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA. [Footnotes omitted.] *Kleppe, supra*, —— U.S., at ——, 96 S.Ct., at 2726, 44 L.W. at page 5107.

This case is in a similar posture to that presented to the United States Supreme Court in *Kleppe*; there is no plan or proposal. Under the marketing program and option contracts, there is nothing that could be the subject of an EIS analysis. A present environmental study of the impact of the ultimate industrial water use would be an unrealistic and useless effort. There is no way that a present evaluation could be

made of the environmental impact of all the potential means of putting industrial water to beneficial use. Here, none of the projects of the owners of the option contracts are far enough along with their plans so that the details of the plans are known, and the environmental consequences could be appraised. The fundamental planning, such as the technology, the point of diversion, the route to be followed by the facilities to transport the water, the place of use, the return flow, the quantity of water to be consumed, the site of the plants, the type and size of the plants, or even the end use, are all unknown at this time.

Once a specific proposal is presented for use of the water, then a thorough, detailed environmental impact statement must be prepared; but, at this juncture, any EIS would be premature and useless.

For the foregoing reasons, summary judgment is granted in favor of the defendants.

### SEVENTH CLAIM FOR RELIEF

The plaintiffs allege that the defendants have failed to give full and objective consideration to the aquatic and game habitat effects on the region's wildlife resources; have failed to consult with the relevant federal and state agencies in planning and evaluating such actions; have failed to give such agencies' recommendations due consideration; and have failed to minimize loss of or damage to wildlife resources, in violation of the Fish and Wildlife Coordination Act, 16 U.S.C. § 661, *et seq.*

*DISCUSSION.*

■ The Fish and Wildlife Coordination Act is designed to apply to new project construction, and has no application to operations and programs under previously constructed projects. The basic requirement of the Fish and Wildlife Coordination Act, *supra*, is that before the waters of any stream are diverted or impounded by any agency of the United States or by any entity operating under a federal permit or license, the agency must first consult with the Fish and Game Service of the Department of the Interior and with the Wildlife Agency of the State in which the diversion or impoundment is to be constructed.

■ The plaintiffs have not alleged that defendants failed to consult with the appropriate state and federal agencies prior to the construction of the Boysen and Yellowtail Units, but have alleged only that the individual water option contracts have been executed without a subsequent independent compliance with the consulting requirements of the Coordination Act.

The plaintiffs' application of the Coordination Act is misplaced. Therefore, summary judgment is granted in favor of the defendants.

### EIGHTH CLAIM FOR RELIEF

Plaintiffs allege that the industrial water marketing program, water option contracts, and related activities violate the percentage allocation program in the Yellowstone Compact; violate the intent and purposes of the Compact by allocating large amounts of water exclusively for industrial uses, as opposed to agricultural uses; and violate the Compact by permitting diversions of the Yellowstone River water for transport and use outside the Basin without the unanimous consent of all signatory states.

*DISCUSSION.*

There is nothing in the Compact which was intended to restrict the amount of water the signatory states could use in the Big Horn River for industrial purposes. To the contrary, the Compact defines beneficial use as including irrigation, municipal, and industrial uses. Article 2(H) and Article 5(B and C).

■ Further, there is no evidence of any violation of the percentage allocation. When the River is fully developed, the final use must fit the apportionment (Wyoming, 80%, and Montana, 20%), but there is absolutely nothing to suggest that development must proceed with one state fully apace with the other, nor to suggest that the water from any particular project must be apportioned by these percentages.

The option contracts do not permit the optionees to use the water out of harmony with the Compact. The notice of appropriation under Montana law expressly notes that the United States was claiming water pursuant to specifically identified statutes and the Yellowstone River Compact Act. All of the option contracts were modified to indicate whether the water would be used in the State of Montana or in the State of Wyoming. Part of the contracts were modified so that there was express reference to the Compact. There were also numerous documents which make reference to the requirements of the Compact.

The plaintiffs simply have no real controversy. No option has been exercised, no water has been delivered or used. So, the water is not being and has not been delivered or used in violation of the Compact.

The amended complaint also asserts that the industrial marketing program violates the prohibition in the Compact against use of water outside the Basin. At this juncture, that allegation is also premature. There is no evidence showing that the defendants have violated the Compact, since at this stage no water has been delivered or used, nor has any place of use been designated.

For the foregoing reasons, summary judgment is granted in favor of the defendants.

IT IS THEREFORE ORDERED that summary judgment is granted in favor of the defendants on Claims One, Four, Five, Six, Seven, and Eight, and Claims Two and Three are dismissed with prejudice. The Clerk shall enter judgment accordingly.