ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs-Appellants,

State of Montana, By and Through the Department of Natural Resources and Conservation, Plaintiff in Intervention,

v.

Cecil D. ANDRUS, Secretary of Interior, et al., Defendants-Appellees,

American Metal Climax, Inc., et al., Defendants in Intervention,

Kerr-McGee Corporation, Defendant in Intervention.

STATE of Montana, By and Through the DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION, Plaintiff in Intervention-Appellant,

v.

Cecil D. ANDRUS, Secretary of Interior, et al., Defendants-Appellees.

Nos. 76–3133, 76–3506.

United States Court of Appeals, Ninth Circuit.

April 18, 1979.

As Amended on Denial of Rehearing June 1, 1979.

849

George W. Pring, Denver, Colo., Cale Crowley, Billings, Mont., for plaintiffs-appellants.

Edward W. Clyde, Salt Lake City, Utah, Peter R. Taft, Asst. Atty. Gen., Thomas Olson, Richard E. McCann, Billings, Mont., Peter R. Steenland, Jr., Washington, D. C., for defendants-appellees.

Before ELY and KILKENNY, Circuit Judges, and FERGUSON,* District Judge.

PER CURIAM.

This is an appeal from the district court's grant of summary judgment in favor of the defendants. *Environmental Defense Fund, Inc. v. Morton*, 420 F.Supp. 1037 (D.Mont. 1976).

In 1944, Congress passed the Flood Control Act, 58 Stat. 887, which established water projects throughout the Missouri River Basin. Two of the projects authorized by the Act are the Yellowtail and Boysen Reservoirs located in Montana and Wyoming. The Department of Interior began a program in 1967 for marketing water from these reservoirs for industrial uses. By 1974, when the action was filed, 658,000 acre feet of water per year had been committed in option contracts for industrial uses. This is approximately 28 percent of the two reservoirs' combined capacity.

Appellants, a coalition of environmental, wildlife and agricultural organizations, including irrigation districts, a livestock company and individual farmers and ranchers, sued for injunctive and declaratory relief, claiming that sale of water from these particular projects for industrial uses was a violation of the Flood Control Act. The district court granted summary judgment for the defendants and found that the Secretary of Interior had properly exercised his statutory authority and had violated neither the National Environmental Protection Act (NEPA) nor the Fish and Wildlife Coordination Act.

* Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

Four issues are presented on this appeal. Appellants contend that the district court erred in finding that:

(1) the Secretary of Interior had authority to enter into option contracts for the sale of water for industrial uses from the Yellowtail and Boysen Reservoirs;

(2) the Secretary properly determined that the industrial water sales would not impair the efficiency of the two water projects for irrigation purposes;

(3) no environmental impact statement (EIS) was required for either the regional marketing plan or the individual option contracts; and

(4) the Fish and Wildlife Coordination Act does not apply to projects constructed prior to its enactment.

The district court is affirmed as to the first and second issues but is reversed on the third and fourth.

## Authority of the Secretary of Interior

 The district court, in a comprehensive opinion, reviewed the Flood Control Act of 1944 and its legislative history and held that the Act authorized industrial use of project water, including water from the Boysen and Yellowtail Reservoirs. The court found that marketing of water for such purposes must be done in accordance with federal reclamation law and, under this law, the Secretary of Interior had authority to sell water for industrial use only if "it will not impair the efficiency of the project for irrigation purposes." 43 U.S.C. § 485h(c).

This court agrees with the district court's interpretation of the relevant statutes and legislative history and affirms the district court's ruling on this issue.

## Proper Exercise of Authority

 Appellants claim that the Secretary of Interior did not properly exercise his authority when determining that the marketing program for industrial water would not impair the efficiency of the projects for irrigation purposes. The district court carefully set forth the scope of the Secretary of Interior's authority and the standard for review of the Secretary's decision. The district court properly concluded that the administrative record provides sufficient explanation and justification for the Secretary's action and there was no error in the administrative determination.

## Environmental Impact Statements

The Yellowtail and Boysen Reservoirs are located in the Northern Great Plains, a region which includes portions of southeast Montana, northeast Wyoming, and western North and South Dakota. The Yellowstone River Basin covers much of this region with the Yellowstone River itself flowing eastward from Yellowstone National Park across southern Montana to join the Missouri River at the Montana-North Dakota border. Three major tributaries flow into the Yellowstone: the Bighorn, Tongue and Powder Rivers. The Yellowtail Reservoir is located on the Bighorn River and the Boysen Reservoir is on the Wind River, a tributary to the Bighorn and Yellowstone Rivers.

Water is a precious and limited resource throughout the Northern Great Plains. The region is sparsely populated and semiarid with an economy based predominately on farming and ranching. This region, however, also contains one of the richest strippable coal deposits in the world, the "Fort-Union Formation." Private industry is active in conducting feasibility studies of petro-chemical development based upon these coal deposits. The availability of water for industrial use in such development is a key factor of feasibility. Thus numerous petroleum and mining companies applied to purchase options for water from the Yellowtail and Boysen Reservoirs as part of their plans to develop the coal deposits. Allocation of the region's water resources will determine the nature and extent of future development, whether agricultural or industrial.

In 1967, the Secretary of Interior began an industrial water marketing program. Neither reservoir at that time had any

water set aside for industrial use and, in a series of decisions, the Secretary approved and allocated 832,000 acre feet of water per year for sale for these purposes. Between 1969 and 1971, pursuant to this plan, the Secretary executed 17 water supply option contracts committing 658,000 acre feet per year for industrial use.

The Boysen Reservoir has a total capacity of 952,400 acre feet of water and the Yellowtail Reservoir has a capacity of 1,375,000 acre feet. Neither reservoir presently provides contract water for agriculture but water from both supplements downstream irrigation. Industrial use of the water would reduce these benefits to irrigation since industrial use would likely provide little or no return flow to the rivers.

No EIS has been prepared for either the industrial water marketing program or any of the individual option contracts. Appellants assert that NEPA requires an EIS for both the overall plan and the individual contract. This court agrees.

### A. Industrial Water Marketing Plan

■ NEPA provides that an impact statement must be prepared and included "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(C). As the Supreme Court noted in *Kleppe v. Sierra Club*, 427 U.S. 390, 399, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1974), when there is no proposed legislation, a party can successfully urge preparation of an EIS only if there is a report, recommendation or proposal for major federal action.

■ The district court relied on *Kleppe* in finding that an EIS was not necessary for either the overall marketing plan or the individual option contracts. The court stated that there is no plan or proposal which could be the subject of an EIS. 420 F.Supp. at 1048. In *Kleppe*, the Supreme Court rejected the argument that a regional EIS analysis should be made to estimate the effect of various federal programs on the coal reserves of the Northern Great Plains region. The Supreme Court found that

"there is no evidence in the record of an action or a proposal for an action of regional scope." 427 U.S. at 400, 96 S.Ct. at 2726. The Court stated:

Absent an overall plan for regional development, it is impossible to predict the level of coal-related activity that will occur in the region identified by respondents, and thus impossible to analyze the environmental consequences and the resource commitments involved in, and the alternatives to, such activity. 427 U.S. at 402, 96 S.Ct. at 2726.

Here there is an overall plan for marketing water from the Yellowtail and Boysen Reservoirs. The Secretary of Interior's action is not mere "contemplation." There has been a proposal for federal action and action has been taken. The Secretary of Interior has determined that the Yellowtail and Boysen Reservoirs can contribute 832,000 acre feet of water per year for industrial use. A marketing program has been developed and option contracts committing hundreds of thousands of acre feet of water for industrial use have been executed in accordance with the program.

The district court believed that "[t]here is no way that a present evaluation could be made of the environmental impact of all the potential means of putting industrial water to beneficial use." 420 F.Supp. 1037 at 1048–1049. In focusing on the uncertainty of industrial use if and when the option contracts are exercised, the court ignored the definite federal action already taken in major commitment of project water to industrial use. Any uncertainty about the details of subsequent use of the diverted water does not obviate the importance of the decision to divert and the necessity to evaluate the environmental consequences of that decision.

Courts have acknowledged and maintained a distinction between an EIS for an overall plan and an EIS for an individual lease, license or contract issued pursuant to the plan. *See Kleppe, supra; Port of Astoria, Oregon v. Hodel*, slip op. 645, 595 F.2d 467 (9th Cir. 1979); *Cady v. Morton*, 527

F.2d 786 (9th Cir. 1975); *Natural Resources Defense Council, Inc. v. Morton*, 388 F.Supp. 829 (D.D.C.1974), *aff'd mem.*, 174 U.S.App.D.C. 77, 527 F.2d 1386 (1976), *cert. denied*, 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). In *Port of Astoria*, this court affirmed the district court's ruling requiring an EIS for both the Bonneville Power Administration's (BPA) regional proposal for development and distribution of power resources and an individual contract to build a power plant at a specific site. BPA argued that an EIS for the regional plan was premature because its fulfillment depended on execution of contracts by industrial customers and execution of most of these contracts remained a "mere contingency." This court rejected this argument:

> It is to be noted, however, that BPA and its large industrial customers are already operating under letter agreements that are, in effect, industrial firm power contracts. In addition, as far as the record shows, BPA has no intention of abandoning its industrial sales policy or the industrial firm power rate and is prepared to execute industrial firm power contracts with its major industrial customers. In these circumstances, NEPA does not permit delaying assessment of environmental factors until BPA is faced with the reality of executed contracts and the necessity of supplying power to industry until 1994. Rather, the assessment should occur at an early stage when alternative courses of action are still possible and environmental damage can be mitigated. (citation omitted) at 478.

Here the Secretary of Interior has no intention of abandoning plans for marketing industrial water and is prepared to execute water option contracts. NEPA does not permit delay in assessing the environmental impact of the marketing plan. The Department of Interior has recognized this need in recent years and has prepared an EIS for a proposed million acre feet annual program of industrial sales for six upper Missouri River reservoirs. Department of Interior, Draft Environmental Impact Statement: Water for Energy, Missouri River Reservoirs (INT DES 76–38, 10/12/76).

## B. Individual Option Contracts

■ All parties agree that an EIS for each individual option contract must be prepared; their only dispute is over the timing of the EIS. Appellants argue that the environmental impact analysis should be done prior to the execution of the option contract. Appellees contend that an EIS need first be prepared when the option is exercised and they seek licensing. This court agrees with appellants and finds that in the context of this case an EIS must be prepared prior to execution of an option contract.

These water option contracts guarantee to the option holder the availability of a certain amount of water whenever the option is exercised and the holder meets the standards for licensing. The term of the contract is 40 years; if actual deliveries do not occur within ten years, however, the contract terminates. The government cannot unilaterally change its mind; the government cannot commit the amount of water to other uses while the option is held. For the term of the contract, it is an "irreversible and irretrievable commitment of the availability of resources." As such, it is a major federal action requiring an EIS. 42 U.S.C. § 4332(C).

The district court was of the opinion that the environmental impact analysis is impossible until the option holder has developed detailed plans and exercises his option. With every individual contract, however, a decision is made to allocate a certain amount of water to a person or corporation engaged in a specific business with certain industrial needs for water. An EIS at this stage is necessary to assist the government in evaluating the impact of the water diversion itself and also alternative commitments of the water. As the Council on Environmental Quality Guidelines for Preparation of Environmental Impact Statements set forth:

> In particular, agencies should use the environmental impact statement process

to avoid or minimize adverse impacts and to evaluate both the long- and short-range implications or proposed actions to man, his physical and social surroundings, and to nature. 40 C.F.R. § 1500.2(b).

This court has also noted that delay in preparing an EIS may make all parties less flexible. After major investment of both time and money, it is likely that more environmental harm will be tolerated. *Latham v. Volpe,* 455 F.2d 1111, 1121 (9th Cir. 1971).

It is true that the details of the option holder's future use of the diverted water may not be known at the time of executing the contract. But it is that time at which the government must decide among various potential users, and in doing so, must conjecture as to possible effects of commitment to one user versus another. An EIS will provide information useful in this analysis. This function of an EIS was discussed in *City of Davis v. Coleman,* 521 F.2d 661, 676 (9th Cir. 1975), where the court ordered an EIS for a proposed freeway interchange:

> It is true that the development potential which the interchange will create comprehends a range of possibilities. The ultimate outcome will depend on the plans of private parties and local government outside the direct control of state and federal government. In this context the purpose of an EIS/EIR is to evaluate the possibilities in light of current and contemplated plans and to produce an informed estimate of the environmental consequences. That the exact type of development is not known is not an excuse for failing to file an impact statement at all. Uncertainty about the pace and direction of development merely suggests the need for exploring in the EIS/EIR alternative scenarios based on these external contingencies. Drafting an EIS/EIR necessarily involves some degree of forecasting.

It is for these reasons that this court finds that NEPA requires preparation of environmental impact statements for the overall industrial water marketing program and for each individual option contract. These requirements are applicable even though the marketing plan and some of the option contracts were executed prior to January 1, 1970. Both the overall plan and the individual contracts are ongoing and require continuing attention and action. Both case law and Department of Interior regulations require fulfillment of NEPA requirements in such situations. *San Francisco Tomorrow v. Romney,* 472 F.2d 1021, 1024 (9th Cir. 1973); *Latham v. Volpe, supra;* 40 C.F.R. §§ 1500.5(2) and 1500.13.

*Fish and Wildlife Coordination Act*

■ The district court held that the Fish and Wildlife Coordination Act "is designed to apply to new project construction, and has no application to operations and programs under previously constructed projects." 420 F.Supp. at 1049. The Secretary now concedes that the holding was in error. The clear language of the statute shows that the Act applies to "modification or supplementation of plans for previously authorized projects." 16 U.S.C. § 662(b).

The case is remanded to the district court for entry of a judgment consistent with this opinion.