**ARVIN–EDISON WATER STORAGE DISTRICT, et al., Plaintiffs,**

v.

**Donald P. HODEL, et al., Defendants.**

**ARVIN–EDISON WATER STORAGE DISTRICT, et al., Plaintiffs,**

v.

**Donald P. HODEL, et al., Defendants.**

**Civ. A. Nos. 82–2466, 83–0232.**

United States District Court, District of Columbia.

March 28, 1985.

Christopher D. Williams, Michael N. McCarty, McCarty, Noone & Williams, Washington, D.C., for plaintiffs.

C. Max Vassanelli, Drake Cutini, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

Joanne Leveque, Office of the Sol., Federal Energy Regulatory Com'n, Washington, D.C., for Federal Energy Regulatory Commission.

Daniel I. Davidson, Donald Weightman, Spiegel & McDiarmid, Washington, D.C., for defendant-intervenor Northern California Power Agency and the Cities of Alameda, Biggs, Gridley, Lodi, Lompoc, Healdsburg, Palo Alto, Redding, Roseville, Santa Clara, and Ukiah, Cal., and the Plumas-Sierra Rural Elec. Coop.

G. Philip Nowak, Charles H. Cochran, James X. Dempsey, Steven G. Reade, Arnold & Porter, Washington, D.C., for defendant-intervenor Sacramento Municipal Utility Dist.; David S. Kaplan, Sacramento, Cal., of counsel.

## OPINION

HAROLD H. GREENE, District Judge.

In these two consolidated actions, plaintiffs, eleven irrigation and water storage districts organized under the laws of California, challenge certain decisions of the Western Area Power Administration of the Department of Energy (WAPA), the Federal Energy Regulatory Commission (FERC), and the Bureau of Reclamation of the Department of the Interior, concerning the marketing of electric power from the federal government's Central Valley Project (CVP) in California.[1] Plaintiffs maintain that the CVP's primary purpose is irrigation, and that they, as irrigators, are entitled under section 9(c) of the Reclamation Project Act, 43 U.S.C. § 485h(c), and section 2 of the Rivers and Harbors Act, to special rates in the purchase of power from the CVP and to an allocation of power ahead of other CVP power customers. The parties[2] have filed cross-motions for sum-

1. The CVP, which is one of the nation's major water conservation developments, consists of 19 storage and diversion dams, 39 pumping plants, and approximately 600 miles of canals; it also includes 10 hydroelectric power plants and over 1,300 miles of transmission lines. The functions of the CVP include flood control, improvement of navigation, irrigation and domestic water supply, and power generation.

2. Two municipal utility districts which are preference customers of CVP—Sacramento Munici-

mary judgment.[3] For the reasons explained below, the Court concludes that these reclamation laws do not require that plaintiffs receive special treatment or a super-preference with respect to rates for or the allocation of CVP electric power sold by WAPA.

## I

Prior to 1977, the Bureau of Reclamation operated the CVP and marketed all CVP power. In the Department of Energy Organization Act of 1977, the Congress transferred the power marketing function to the Department of Energy which, in turn, delegated those functions in part to WAPA. The actual division of responsibilities was formalized in a March 1980 Agreement between WAPA and the Bureau. Under this agreement, the Bureau continues to operate the CVP and to allocate power used for CVP functions (*i.e.*, project use power)[4] and WAPA, in accordance with section 9(c) of the Reclamation Project Act, markets all power and energy generated by the CVP in excess of that needed by the Bureau for CVP functions.[5] All eleven plaintiffs are under contract with WAPA to receive electric power for irrigation pumping from the CVP.[6] Eight of the plaintiffs also receive CVP water for irrigation from the Bureau. Plaintiffs have always received allocations of surplus power from the CVP in the same manner and at the same rates as other preference customers.

In 1975, the City of Santa Clara, California, a CVP preference customer, filed a lawsuit against the Bureau alleging inequalities in the allocation of CVP power.[7] After the District Court and the Court of Appeals for the Ninth Circuit had rendered their decisions, the parties negotiated a settlement which, among other things, gave the United States the option to market an additional 102 megawatts (MW) of electric power.[8] WAPA subsequently notified CVP customers of the Santa Clara settlement of its intention to develop a plan for allocating the 102 MW. Between July of 1980 and October of 1981, WAPA held a series of public information and comment forums to solicit comments on the issues of whether it should market the additional 102 MW and, if so, how and to whom. In connection with the rulemaking procedings, WAPA received a large number of comments, including those of the plaintiffs who opposed the marketing proposal.

On August 17, 1981, WAPA published its final decision to market the 102 MW, and it announced its final allocation criteria along with a solicitation for applications for allocations of the 102 MW. 46 Fed.Reg. 41,-547.[9] A number of irrigation and water

---

pal Utility District and Northern California Power Agency—sought and were granted the right to intervene as defendants in this lawsuit. Both of these intervenor-defendants have filed their own motions for summary judgment.

3. The parties agree that there are no material facts in dispute and that the issues are legal and therefore appropriately decided by summary judgment.

4. This power is used to operate CVP facilities such as pumps used to pump water for municipal, industrial, and irrigation purposes, and to serve other Bureau facilities such as project offices and power plants.

5. During fiscal year 1982, the Bureau used approximately 12% of the total CVP power output.

6. Plaintiffs purchase approximately three percent of the total CVP power marketed. Ninety-five percent of this power is used for irrigation pumping purposes.

7. *City of Santa Clara v. Kleppe,* 418 F.Supp. 1243 (N.D.Cal.1976), *rev'd sub. nom, City of Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir.1978).

8. Pacific Gas and Electric Company, a party to the suit, agreed to support an increase in the CVP customer load level of up to 102 MW. WAPA and the other federal agencies were given the right, but not the obligation, to market this additional power.

9. In support of its decision to market the additional 102 MW, WAPA stated that, under the settlement agreement,

[I]ts goal ... is to provide the maximum service within the limits of the contractually prescribed load levels and its responsibilities under the reclamation laws. In the market area, the views and needs of the preference customers and eligible preference entities are widely diverse. [WAPA] developed the marketing program and allocation criteria so as to provide the most widespread use of the Federal power among preference entities, consistent with sound business principles and legal, contractual, and physical contraints.

Although marketing the 102 MW will result in increased purchased power requirements, [WAPA] believes that, given [its] multi-State

districts, including four of the plaintiffs, were among the 74 entities that applied to WAPA for an allocation of the 102 MW.[10] On January 25, 1982, WAPA announced its final power allocations as follows: 46 MW was reserved for Westlands Water District, one of the plaintiffs in this action, but 42 of this 46 MW were allocated to other applicants on a withdrawable basis to be made available when Westlands had a need for the additional power. Another 26 MW went to preference entities on a firm basis, 21 of it to irrigation or water districts.[11] The remaining 30 MW was allocated as "firming" power for renewable resources and cogeneration facilities.[12] Both the decision to market this additional 102 MW of electric power and the manner in which it was allocated are challenged by plaintiffs in the first action—Civil Action No. 82-2466.

Plaintiffs' second action, Civil Action No. 83-0232, challenges the rate increases for CVP power. Beginning in 1977, the government initiated rate proceedings in order to raise rates for CVP power because existing power rates did not produce enough revenue to satisfy legal requirements.[13] The government first considered adopting two alternative rate schedules: (1) a flat rate for all CVP power customers and (2) a dual rate schedule, one rate which would apply to customers with fixed allocations and to that portion of load-growth customers' loads established prior to 1967, and another, higher rate which would apply to the growth portion of the load-growth customers' loads, reflecting the higher cost of "purchased power" needed to supply these customers.[14] After receiving comments on the rate proposals, WAPA in October of 1979 issued an order rejecting the dual rate concept and adopting a single uniform rate for all CVP customers. FERC, however, disapproved and rejected the proposed rate schedule in 1982 on the ground that it was too low to provide sufficient revenues to recover CVP's operating costs and to repay the federal investment within a reasonable time.[15]

Another round of CVP rate adjustment proceedings was conducted,[16] and in April 1983, WAPA submitted substitute rate schedules, i.e., a "uniform rate with period-

---

transmission systems and ability to acquire resources in other market areas, [WAPA] will be better able to acquire power cheaper than its customers could individually. [WAPA] can achieve savings resulting from economies of scale for the benefit of each individual customer.
46 Fed.Reg. 41,551 (August 17, 1981).

**10.** Twenty-four irrigation and water districts applied for a total of 375 MW, only eleven of these districts were granted allocations of power. The total allocation for irrigation and water districts was 25 MW, this includes the 4 MW of firming power that was allocated to irrigation districts, see note 12, *infra.*

**11.** WAPA allocated the 46 MW of withdrawable power and 26 MW of nonwithdrawable power to a number of preference entities on a pro rata basis. Entities that currently received firm power from the CVP were ineligible to receive any of the new firm power from this 72 MW, but could receive allocations out of the 30 MW reserved for firming renewable resources and cogeneration projects.

**12.** Irrigation districts received 4 MW of this power, one MW of which was allocated to Glenn-Colusa Irrigation District, another plaintiff in this action.

**13.** The Reclamation Project Act requires that rates for the sale of commercial power be established at a level sufficient to repay the annual power operation and maintenance costs of the project, to repay with interest within 50 years the capital costs allocated to power, and to repay without interest that part of the irrigation capital costs determined to be beyond the ability of irrigators to repay. The CVP power rates in effect in 1977 had not been altered since 1945.

**14.** Purchased power is power not generated by CVP facilities but purchased from other generating sources and supplied to CVP customers. Purchased power is generally more expensive than CVP-generated power.

**15.** FERC Order of May 4, 1982, Appendix 2 to Plaintiffs' Rate Complaint. WAPA's rates are subject to confirmation and approval by FERC. FERC cannot, however, adjust or modify the rates proposed. If FERC disapproves the rates, it must send them back to WAPA for further consideration and refinement.

**16.** The notice of these proceedings provided that WAPA would consider three alternative rate structures for CVP power customers. Under each of the three alternatives, a uniform rate schedule would be applied to all preference customers.

ic energy stair steps." These rates were given effect on an interim basis on May 25, 1983, and they were ultimately confirmed and approved by FERC for a five-year period on November 30, 1983.

## II

The problem these consolidated actions address is the increase in plaintiffs' power rates as a consequence of the government's CVP power marketing activities. Plaintiffs claim that because the primary purpose of the reclamation laws and the CVP is to reclaim arid land through irrigation, they, as irrigators, are entitled to a separate, lower rate and a greater preference in the allocation of CVP electric power than other customers. As they view it, the decision of WAPA to charge them the same rates it charges non-irrigators and its decision to market CVP power in a manner which benefits other preference customers—which results in a direct or indirect increase in their own rates—violates these reclamation laws.

More specifically, although plaintiffs claim that they are entitled to the so-called project use rate, they also state that they are willing to settle for an alternative rate which excludes, at a minimum, certain cost components included in WAPA's commercial power rates—*i.e.*, interest on capital investment, aid to the project's irrigation function, and most particularly, purchased power costs. Beyond that, plaintiffs note that if the Court grants them the rate

relief they seek, their claims in the allocation complaint concerning WAPA's decision to market the additional 102 MW and its allocation of that power "will virtually disappear" and that the Court may treat these matters as moot. Plaintiffs' Motion for Summary Judgment at 86.

■ A. Plaintiffs are clearly not entitled to CVP power at the project use rate. In the first place, in spite of its name, this is not a rate but an interdepartmental accounting mechanism, a bookkeeping entry to account for the power used by the Bureau in operating the CVP. This accounting procedure permits the Bureau to transfer a portion of power-related expenses to the water-related functions which use project power, *i.e.*, irrigation, municipal and industrial water, fish and wildlife conservation, and water rights.[17]

This distinction in treatment makes good sense. The CVP facilities which were specifically authorized by Congress were built exclusively with federal funds, and they are owned and operated by the federal government. By contrast, plaintiffs are entities organized under state law whose facilities are not federally owned and which, except in the case of two plaintiffs, were financed with private funds. It is clear that the "project" in this case consists of only those CVP facilities owned by the federal government; it does not include facilities owned by local entities such as plaintiffs.[18] Indeed, the contracts between the irrigators and WAPA specifically provide that they are receiving surplus power not required for project operations.[19]

---

**17.** The project use rate is set at a level sufficient to cover the costs of operation, maintenance, replacement, and transmission services associated with delivering power to these project functions, but is available only where the Bureau owns and operates main conveyance pumping facilities and where the United States owns the distribution pumping facilities that provide water service to a specific water service district.

**18.** The 1954 Reclamation Instructions cited by plaintiffs are not to the contrary. Part 221.3A defines "Federal Project" as "any irrigation project in which title to the irrigation works is vested in whole or in part in the United States." Part 198.2.6.D. further provides that "Project" includes "[a]ny reclamation or irrigation project, including incidental features thereof, authorized or constructed by the United States

under Federal reclamation laws ... or in connection with which water deliveries are made by contract executed by the United States pursuant to said laws ...." (See Plaintiffs' Memorandum at 82).

**19.** These contracts provide in pertinent part that:

> Power and energy delivered to the Contractor hereunder is part of the power and energy generated at Project generating plants, as supplemented by power and energy from such other sources as Reclamation may provide, which is not required for Project operation, or to supply preference customers in Trinity, Tuolumne, and Calaveras Counties, California, in accordance with the requirements of Reclamation Law ... The United States may also at the sole discretion of the Contracting

■ It is immaterial that plaintiffs' distribution facilities are "integrally connected" with federally owned canals and distribution facilities and that they may comprise the "last essential link" between the stored water and arid land. The physical interconnection of federal facilities with those of the irrigators to transfer CVP water does not make them part of the CVP,[20] any more than a municipality whose streets are connected with federal interstate highways becomes for that reason a part of the federal government.

B. Plaintiffs also cite to the "Minidoka precedent" where the irrigation districts within the project area were provided project power for irrigation pumping at the project use rate. The Minidoka situation, however, is clearly different. The federal government constructed and operated the Minidoka Project pursuant to the provisions of an earlier reclamation statute. While the project's day-to-day operations and management were later transferred to the irrigation districts, the United States continued to retain title to that project.

■ C. Plaintiffs cite next to certain statutory provisions. First, they claim that their distribution systems were specifically authorized for inclusion by the Rivers and Harbors Act. While the Rivers and Harbors Authorization Act of 1950 provided that the Secretary could, if he deemed it necessary, expend funds for the construction of distribution systems, it did not specify that *all* distribution systems were to be regarded as part of the project. Here,

none of plaintiffs' distribution systems was federally constructed, but they were all organized privately for the purpose of distributing water from the project to their constituent members.

■ Second, two irrigators—Arvin Edison and San Luis—make the point that they received federal loans for the construction of their facilities under the Distribution Systems Loan Act, 43 U.S.C. §§ 421a–h.[21] However, there is nothing in the Act to indicate that recipients of such loans who construct distribution facilities thereby become part of the United States government. The terms of the Act, in fact, reveal the contrary. For example, section 421b expressly requires that the recipients of a DSLA loan must be an entity "which is organized under State law and which has capacity to enter into contracts with the United States pursuant to Federal reclamation laws." Likewise, the Act states that loans are "[t]o assist financially in the construction of ... *local* distribution and drainage systems."[22] Clearly, the Congress contemplated that the facilities constructed by non-federal entities using DSLA loans were to be distinct from the federal project.

■ If all of these considerations were not dispositive, there is also the fact that WAPA, and its predecessor the Bureau, have never regarded plaintiff irrigation and water districts as part of the project, but have consistently treated them in the same manner as they treat all other preference

---

Officer reduce the total contract rate of delivery hereunder by any amount necessary to supply the Project use requirements of the Central Valley Project.
Contract between WAPA and the Banta-Carbona Irrigation District Art. 7(b), Government Memorandum, Tab G.

**20.** Indeed, three of the eleven plaintiffs do not even receive water from the CVP and are not physically connected with federally owned canals.

**21.** This section provides in pertinent part that Distribution and drainage systems authorized to be constructed under the Federal reclamation laws may, in lieu of construction by the Secretary of the Interior, ... be constructed

by irrigation districts or other public agencies according to plans and specifications approved by the Secretary,

. . . . .

43 U.S.C. § 421a.

**22.** The 1972 amendments further provide that "the delivery and distribution of municipal and industrial water supplies shall be deemed to be an authorized project purpose under the [Act], and where appropriate, an allocation of loan funds acceptable to the Secretary shall be made between irrigation and municipal and industrial purposes." 43 U.S.C. § 421e. If the irrigators' argument were correct, those entities that receive loans under the DSLA for industrial and municipal purposes would also become part of the project.

customers. On this basis, plaintiffs—some of which have been receiving power from the CVP for over thirty years—have always paid the applicable commercial power rate for CVP power pursuant to contracts with the United States.[23] This longstanding and consistent agency interpretation of what constitutes part of the CVP as well as its treatment of irrigators as preference customers is entitled to special deference. See *Zenith Radio Corp. v. United States,* 437 U.S. 443, 457–58, 98 S.Ct. 2441, 2448–49, 57 L.Ed.2d 337 (1978); *Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 409–10, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 279 (1975); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

**III**

Plaintiffs argue next that, even if they are not considered part of the CVP, they were incorrectly grouped with all other CVP preference customers by being required to pay the uniform commercial power rate. This rate includes a number of cost components which irrigators are allegedly neither required nor intended to repay,[24] and it includes costs, most notably purchased power costs, which the irrigators allegedly had no part in incurring.[25] At the very least, plaintiffs say, they are entitled to a special irrigators rate which excludes these costs or "such other irrigation pumping rate as would be just and reasonable,"[26] and that the WAPA's uni-

---

**23.** In accordance with this interpretation, the government denied requests for a separate irrigation rate by Arvin-Edison made in the 1960s and in the Bureau of Reclamation rate proceedings initiated in 1973.

**24.** For example, commercial purchasers of CVP power are required to pay aid to the project's irrigation function. This "aid to irrigation" is the portion of a Reclamation Project's capital investment allocated to the irrigation water supply function which the Bureau has determined is beyond the water users' ability to repay. This portion of the capital costs are then sub-allocated to the power function to be recovered from commercial power revenues. Plaintiffs contend that to require irrigators to pay this component would contravene the legislative purpose of the reclamation laws.

**25.** Under WAPA's approved rates, all CVP customers share the burden of purchased power expenses. According to plaintiffs, purchased power accounts for the largest single component of the CVP's annual operating costs, and that the average cost per kwh of purchased power is between three to ten times the cost of CVP hydrogenerated power.

Plaintiffs contend that a majority of CVP's purchased power is needed solely to satisfy post–1967 allocations, and on that basis, they argue that only those CVP customers who are responsible for the incurrence of these costs (*i.e.,* new customers and customers whose energy loads have increased—"load growth customers"), should bear the costs. They maintain it is unfair to require customers whose loads have remained essentially fixed for a number of years (*e.g.,* irrigators) to "subsidize" the higher cost of power purchased by CVP solely to meet the expanding demand of municipalities and other load growth power customers.

**26.** Plaintiffs' Amended Complaint in C.A. No. 83–0232 at 19. The irrigators maintain that a

separate irrigation pumping rate is not only appropriate but required under the federal reclamation laws. They quote the following standard to identify situations in which rate differentials are appropriate:

There are two kinds of situations in which rate differentials are appropriate. One is where there is a difference in the character of the service rendered and it can be shown that one service is more costly than the other. The other situation is where a customer or customer group has been assigned a supply of power from one generating unit or other source and both the service and the rate can be identified with the source.

However, after applying this standard to the sale of CVP power, the Assistant Secretary concluded that load growth service does not fall clearly into either of those situations. First, no customer or group of customers is assigned a supply of power from one generation unit or other source. In fact, the contracts of the irrigators as well as other preference customers specifically provide that the power delivered to the purchaser "is part of the power and energy generated at Project generating plants, as supplemented by power and energy from such other sources as Reclamation may provide which is not required for project operation or to supply preference customers in [certain geographical areas]." See note 18, *supra.*

Second, irrigators do not receive a different character of service than other preference customers. Thus, under the test quoted above, WAPA's decision not to implement a dual power rate was appropriate.

In any event, there is nothing in the reclamation laws—the laws governing the marketing of CVP power—that requires anything other than a uniform rate. Moreover, the bifurcated rate structure suggested by plaintiffs may well be contrary to general principles of public utility law (to the extent that they are applicable) which

form rate structure discriminates against fixed load customers. In support of this argument, plaintiffs rely on two statutory provisions.

A. Section 9(c) of the Reclamation Project Act [27] provides guidance with respect to three aspects of the sale of power —rates, preferences, and impairment. First, this section requires the Secretary to set power rates which, in his judgment, will be sufficient to recover operation and maintenance costs, interest, and other fixed charges related to the reclamation project.[28] Second, it requires the Secretary to give a preference in the sale of power to "municipalities and other public corporations or agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrication Act of 1936."[29] Third, it prohibits the Secretary from entering into any contract relating to municipal water supply, to electric power, or to miscellaneous purposes which in his judgment would impair the efficiency of the project for irrigation purposes.

■ A simple reading of this provision reveals that Congress could not have intended to establish a separate power rate for the benefit of certain classes of customers, such as irrigators. To begin with, section 9(c) creates only one standard for the setting of rates for the sale of power from reclamation projects—"*[a]ny sale* of electric power ... shall be ... at such rates as in [the Secretary's] judgment will produce revenues at least sufficient to cover an appropriate share of [certain specified costs]" (emphasis added). Nothing in the statute or its legislative history indicates, much less requires, WAPA to grant irrigators any additional or greater preference in the sale of project power. To the contrary, section 9(c) clearly contemplates that irrigators would be treated the same as other preference customers.

The lack of statutory authority for plaintiffs' claim to lower rates is even more telling when section 9(c) is contrasted with those sections in the Reclamations Project Act governing the sale of CVP water. In section 9(d), Congress explicitly directs the Secretary to consider "economic factors pertinent to the ability of the organization to pay" in structuring repayment obligations imposed by contracts for the sale

require a utility's incremental costs to be combined and charged to all customers within the same class of service.

**27.** This section provides in pertinent part:
... Any sale of electric power or lease of power privileges, made by the Secretary in connection with the operation of any project or division of a project, shall be for such periods, not to exceed forty years, and at such rates as in his judgment will produce power revenues *at least sufficient to cover an appropriate share of the annual operation and maintenance cost, interest on an appropriate share of the construction investment at not less than 3 per centum per annum, and such other fixed charges as the Secretary deems proper: *Provided further,* That in said sales or leases preference shall be given to municipalities and other public corporations or agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrication Act of 1936. Nothing in this subsection shall be applicable to provisions in existing contracts, made pursuant to law, for the use of power and miscellaneous revenues of a project for the benefit of users of water from such project. The provisions of this subsection respecting the terms of sales of electric

power and leases of power privileges shall be in addition and alternative to any authority in existing laws relating to particular projects. No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes.

**28.** Before a reclamation project is constructed, *the Secretary of the Interior decides what part of the estimated construction cost can be allocated to irrigation, what part to power, and what part to commercial municipal water or other miscellaneous purposes. The Secretary then determines what construction costs can be recouped from the beneficiaries of these services. Because irrigators are generally unable to pay all the capital costs allocated to the irrigation purpose, the Bureau determines, for each irrigation development, what part of these costs the irrigators can repay and then assigns the remainder to be repaid from power revenues. This is known as the "irrigation subsidy" or "irrigation assistance."

**29.** Plaintiffs' irrigation districts are preference customers because they are "public agencies" under California law.

of water. 43 U.S.C. § 485h(d)(3).[30] Likewise, section 9(e) provides that such contracts for the sale of water may be made at a rate that excludes interest in the capital construction cost allocated to the project's irrigation function. 43 U.S.C. § 485h(e). And section 17 of the Act authorizes the Secretary to defer any payment due under a water contract if he finds that "the installments under consideration probably cannot be paid on their due date without undue burden on the water users, considering the various factors which in the Secretary's judgment bear on the ability of water users so to pay." 43 U.S.C. § 485b–1(b).

In light of these provisions in the same Act the Court concludes that, if Congress had intended to provide irrigators who purchase project power with comparable rate relief or special rates, it would have stated so explicitly. See *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979); *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1095 (5th Cir.1980).

■ B. The Rivers and Harbors Act of 1940, which reauthorized the CVP, also establishes a priority for the use of CVP facilities as follows: "first, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses; and third, for power." Pub.L. No. 76–868, § 2, 54 Stat. 1198, 1199.

That Act provides even less support for plaintiffs' claims. Neither the authorizing purposes nor the operational instructions of the Act provide any guidance with respect to the marketing of project power or with respect to the rates to be charged. The statute merely refers to the federal reclamation laws as controlling the operation of the CVP and it directs that the CVP power operations not interfere with the amount of water available for the water operations of the project, which include irrigation. Furthermore, section 2 of the Act places irrigation and domestic uses on the same priority level, undercutting plaintiffs' argument that they cannot be charged for certain costs associated with increased domestic uses.[31]

■ C. These interpretations of the statutory language are supported by the construction given to the reclamation laws by the agencies charged with their implementation and by the policies underlying the statutes. The operational agencies have consistently regarded irrigation districts as part of the single preference class, and they have never accorded them lower rates, a greater priority in the allocation of power, or any other special treatment. The administrative interpretation of these provisions, as well as the longstanding and consistent agency treatment of irrigators, is entitled to deference. See *Zenith Radio Corp. v. United States, supra; Chemehuevi Tribe of Indians v. FPC, supra; Udall v. Tallman, supra.*

■ D. The government's position is also convincing from a policy perspective. If every entity performing a water function[32] were entitled to a special CVP power rate and a preference in the allocation of CVP power, even in those cases where the entity was not using CVP water (as is true with respect to three of the plaintiffs), all irrigators in the CVP marketing area could and most likely would buy CVP power, leaving little or no power for municipal purposes, thus defeating the intent of Congress in enacting the preference clause.[33]

---

**30.** Those costs that are deemed beyond the irrigators' ability to repay are assigned by the government to the power function of the project and paid by commercial power customers. See note 28, *supra.*

**31.** Plaintiffs allege that municipalities are among the load growth customers responsible for CVP's increased purchased power costs. However, municipalities are one of the types of organizations entitled to a preference in the sale of power from reclamation projects pursuant to section 9(c), 43 U.S.C. § 485h(c).

**32.** Under plaintiffs' reading of the reclamation laws, entities using water for navigation purposes would presumably be entitled to an even greater allocation of power and even lower rates.

**33.** There are 268 irrigation water customers in the CVP area, currently only 18 receive CVP power.

Moreover, if these irrigators received CVP power at the rates urged by plaintiffs, WAPA would not be able to recover its costs as required under the Reclamation Project Act, 43 U.S.C. § 485h(c), thus further frustrating Congress' intent by eliminating power revenues as a source of assistance in the repayment of costs associated with the project's irrigation functions which the Secretary has determined are beyond the ability of irrigators to repay. The CVP is a multipurpose project; it was not intended to serve only one of its authorized functions.

## IV

Plaintiffs contend next that the government's refusal to grant them special treatment or a greater preference in the sale of CVP power impairs the efficiency of the project for irrigation purposes in violation of section 9(c) of the Reclamation Project Act.[34] That claim, too, must fail.

A. The impairment provision is not concerned with the rates paid for or the allocation of power generated by the CVP; it deals with the question of when power may be sold—*i.e.,* when the sales will not impair the project's efficiency. Furthermore, if, as the Court has found, the preference clause merely places irrigators on par with other preference customers, it would be inconsistent to grant to the irrigators a super preference under the impairment clause in the same section. Principles of statutory construction require that a statute be read so as to give meaning and effect to each word used. See *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955); see generally, 2A *Sutherland Statutory Construction* § 46.06 (4th ed. 1984).

In any event, the economic harm which plaintiffs will allegedly suffer due to increased power rates is not the type of impairment contemplated by the Act. There is no authority in support of plaintiffs' claim that "impairment" includes economic harm. To the contrary, the statutory language and legislative history of the impairment clause[35] refer only to the efficiency of the project's irrigation functions—that is, its ability to deliver water for irrigation.[36] Section 9(d) of the Reclamation Project Act governs the furnishing of water for irrigation, while section 9(c) deals with the furnishing of water for noirrigation purposes as well as the sale of electric power. Section 9(c) is not concerned with irrigators (except to the extent that they qualify as preference power customers), and the impairment clause at the end of that section is intended to safeguard the *water* necessary to carry out the irrigation function of the project.[37]

What case law exists in this area also supports the proposition that "impairment," as that term is used in section 9(c), encompasses only physical impairment,[38]

**34.** This argument assumes that the irrigators are part of the project—an assumption which, for the reasons discussed *supra,* is mistaken, particularly in the case of the three plaintiffs which do not receive CVP water. Accordingly, any alleged harm plaintiffs may suffer as a result of the increased power rates does not contravene the impairment clause because the *project* will still have sufficient water to perform *its* irrigation functions and sufficient power to pump the *project's* water.

**35.** Similarly, the operational clause of the Rivers and Harbors Act does not provide entities which perform water functions protection from economic harm of the type alleged by plaintiffs.

**36.** Plaintiffs cannot claim that the government's actions will cut back on the power necessary to operate the CVP pumps or otherwise impair the ability of the CVP to deliver water for irrigation, or that they are being denied water for irrigation, that the price of water is too high, or that they are being denied adequate power for their irrigation pumping. They complain only that the present rate structure forces them to "subsidize" the cost of supplying power to other nonirrigation preference customers, imposing a "serious economic hardship" on the districts and their constituent irrigation farmers. Rate Complaint at 3.

**37.** This water could be diverted by nonirrigation water contracts or by power contracts, both of which require the release of water that could result in the unavailability of water needed for irrigation or that could leave the project without sufficient electric power to operate its pumps.

**38.** See *City of Santa Clara v. Andrus,* 572 F.2d 660, 672 (9th Cir.1978) (the impairment provision limits sales of project electricity that would "have the effect of cutting back on the power necessary to operate the project's pumping facilities"). See also, *Environmental Defense Fund,*

and that construction of the section is also supported by the consistent and longstanding interpretation of the impairment clause by the agencies charged with the implementation of the reclamation laws.[39] This construction, which the Court finds is reasonable, is of course entitled to deference for the reasons and the decisions cited above.[40]

■■■ B. Even if it be assumed *arguendo* that the Act recognized the type of

Inc. v. Morton, 420 F.Supp. 1037, 1044–45 (D.Mont.1976), *aff'd in relevant part sub nom. Environmental Defense Fund, Inc. v. Andrus,* 596 F.2d 848, 850 (9th Cir.1979) (In determining whether industrial water use will impair the efficiency of the project for irrigation purposes, the Secretary analyzed the water supply and irrigation needs of the project and concluded that the industrial water use would not impair project irrigation efficiency).

**39.** In a Memorandum dated April 24, 1975, the Assistant Solicitor, Power, Office of the Department of the Interior, stated that:

We think [Arvin-Edison's claim regarding the impairment provision] is a strained interpretation of the word "efficiency" in the quoted statute. What Congress had in mind was hydraulic or mechanical efficiency, not financial equity. The principal target of the statutory prohibition is a power sales contract that commits the Secretary to release water for power generation when the irrigation purposes of the project require that water be held or diverted for irrigation use.
Memorandum at 9–10.

In line with this interpretation, WAPA and its predecessor agency (the Bureau) have consistently rejected the irrigators' claim that they are part of the CVP or that, as irrigators, they are entitled to a super preference with respect to rates for or the allocation of CVP power. See particularly, 48 Fed.Reg. 18,881 (April 26, 1983); 46 Fed.Reg. 51,224 (October 6, 1981); 46 Fed. Reg. 41,547 (August 17, 1981); 44 Fed.Reg. 57,-962 (October 6, 1979). See also FERC Orders dated May 4, 1982 and July 2, 1982, docket number ER80–5011, and Memorandum of intervenor-defendant NCPA at 33–50 (citations to government memoranda and opinions rejecting irrigators' claims dating back to May 12, 1960).

In fact, since the 1950s and 1960s, plaintiffs have entered into contracts which require them to pay the standard commercial power rate charged to all preference customers and which subordinate their allocations to project pumping loads—terms which plaintiffs now allege are unlawful.

**40.** In reviewing the agency's action, the task for the reviewing court is "not to interpret the stat-

economic harm alleged by plaintiffs, they would have failed to state a claim. Not only have plaintiffs failed entirely to present any evidence of impairment,[41] but the record before the Court indicates that the rate increases will not have the devastating effect that plaintiffs allege. To be sure, the new rates represent a proportionally large increase.[42] Yet the current CVP commercial power rate is still only one-fourth the comparable Pacific Gas and Electric Company rate,[43] and, according to

ute as it [thinks] best but rather the narrower inquiry into whether the [agency's] construction was 'sufficiently reasonable' to be accepted by a reviewing court. To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) (citations omitted). See also, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

**41.** Even after WAPA put them on notice in 1979 that there was no evidence to show actual impairment, plaintiffs failed to allege any facts which would demonstrate that their irrigation functions would actually be impaired or that their farming operations would be less efficient. Moreover, despite their higher power costs, none of the plaintiffs have sought deferment on payments under their water contracts under section 9(d) of the Reclamation Project Act, 43 U.S.C. § 485h(d).

If, as the plaintiffs allege, the increased rates will impair their irrigation operations, then they, as the parties alleging the injury and who have unique access to the facts which would demonstrate such injury, have the duty to proffer the evidence. In light of plaintiffs' failure to do so, the "adverse inference rule" supports, if not requires, a finding of nonimpairment. This rule provides that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him," *International Union (UAW) v. NLRB,* 459 F.2d 1329, 1336 (D.C.Cir.1972), or in this case, does not exist.

**42.** The approved power rates, which are currently scheduled to continue to escalate annually through 1986, represent an increase of more than 300% over the first rate increase (Rate Order WAPA–2) and more than a 750% increase over the pre-1978 rate.

**43.** This is so despite a huge increase in the demand for CVP power in recent years. The

an environmental impact statement prepared in connection with the proposed rate increase in 1977, the cost of CVP power after the rate increase will still be less than the rate for other power supplies in the area.

With respect to the impact of the new increased rates on irrigators in particular, the EIS concluded that

> Irrigation districts located within the Sacramento and San Jaoquin Valleys would pass on the increased costs to the member farmers, who in turn, must charge more for their commodities. Since the power cost is a very small part of the total cost of commodities, the economic impact of the proposed power rate increase would be negligible.

EIS at 14. A second EIS completed in January of 1983 which undertook a more detailed analysis of the effect of the rate increases on irrigators reaffirmed these findings.[44]

In any event, the language of section 9(c) vests the Secretary with discretion to determine whether WAPA's power marketing activities will impair the efficiency of the project for irrigation purposes. Even if the Secretary's discretion is limited and therefore properly subject to judicial review,[45] the Court could not find that the Secretary abused its discretion. The Secretary's findings that WAPA's decision to market an additional 102 MW and that the increased power rates will not impair the project's ability to perform its irrigation functions are entitled to special deference. Not only is the subject matter of the reclamation laws, and the impairment clause in

particular, of a kind traditionally left to the expertise and judgment of the administrative agencies, but questions of the timing of the release of water for irrigation and power generation as well as the issue of what activities or contracts may "impair" the efficiency of the project's irrigation functions are complex and technical and not susceptible to judicial second-guessing.

This does not mean that the agency's determination of no impairment is totally unreviewable. Certainly, the Court has the authority and the duty to inquire as to whether the Secretary has exercised his discretion. See *City of Santa Clara v. Andrus*, 572 F.2d 660, 671–72 (9th Cir. 1978); *Arizona Power Pooling Association v. Morton*, 527 F.2d 721, 727–28 (9th Cir.1975); *Environmental Defense Fund, Inc. v. Morton*, 420 F.Supp. 1037, 1044 (D.Mont.1976), *rev'd in part on other grounds sub. nom., Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d 848 (9th Cir.1979). Here, however, plaintiffs do not allege that the Secretary did not exercise his discretion, but they state only that they "think it is inconceivable that the Secretary properly exercised his judgment in these proceedings, since his view of what may constitute 'impairment' under the 1939 Act is erroneous in the first place." Plaintiffs' Opposition Memorandum at 7. For the reasons already stated, the Court disagrees.

**V**

To the extent that there is anything left of plaintiffs' allocation complaint,[46] the

Court notes that there is a significant amount of non-CVP power used for irrigation in the CVP area and a considerable number of CVP water users who do not purchase CVP power. In fact, many irrigators in the CVP marketing area buy power from PG & E at a rate four times the CVP rate. If, as plaintiffs claim, defendants' refusal to charge them a special irrigation power rate impairs the CVP for irrigation purposes, even though not all of them use CVP water, then it follows that the irrigation purposes of the CVP are further impaired by denying all irrigation water users in the area a special power rate. However, even plaintiffs concede that nothing in the reclamation law requires that all irrigators be provided reclamation project power.

**44.** This EIS found that the price of CVP power in real dollars, taking into account the full impact of the proposed rate increase, had increased less since 1945 (the date the first rate schedule for wholesale firm power became effective) than the price of non-CVP wholesale electricity. On that basis, the EIS concluded that "there would be no significant socioeconomic impact." EIS at 17.

**45.** The government maintains that the question of impairment is one committed to agency discretion as a matter of law and therefore not subject to judicial review.

**46.** See p. 1212, *supra*.

Court finds that it, too, lacks merit. In that regard, plaintiffs make three separate but interrelated claims. First, they claim that the government's decision to market an additional 102 MW of electric power violated the reclamation laws because WAPA is authorized to sell only power produced by the project which is surplus to the project's operational requirements, plus whatever purchased energy is necessary to firm the project's reliable capacity during off peak periods of consumption. Second, they contend that the marketing of this additional 102 MW will increase the purchased power requirements of the project and thus increase the power rates of WAPA's irrigation customers. Third, they argue that the manner in which WAPA allocated the additional power—*i.e.*, its decision to allocate the "vast majority" of the 102 MW to nonirrigation users—impairs the efficiency of the project for irrigation purposes in contravention of the reclamation laws.

■ As already indicated, plaintiffs' major objection to WAPA's decision to market the additional 102 MW is that it will increase power rates.[47] The present total hydroelectric generating capacity of the CVP is 1751 MW. Currently, the CVP customer load is 1152 MW, this includes the 102 MW at issue in this action.[48] Over the years, Congress has approved WAPA's importation of additional power from the Northwest to serve CVP's California preference customers.[49] Before 1964, the CVP load was 450 MW, in 1964 it was increased to 920 MW, in 1975 to 985 MW, and in 1980 up to 1050 MW. The Bureau's decisions to increase the CVP load were based upon technical considerations having to do with the operation of the CVP. Plaintiffs apparently do not contest the authority of the Bureau to purchase sufficient energy to support the CVP hydroelectric capacity of 1751 MW. Because the decision to increase the CVP customer load an additional 102 MW to 1152 MW is well within WAPA's statutory authority, plaintiffs' first ground for invalidating WAPA's allocation decision must be rejected.

■ With respect to the claim that the marketing of the 102 MW will increase rates, WAPA concedes that nonproject generated energy, which is considerably more expensive, will increase CVP's operating costs. Nevertheless, WAPA states that due to its multi-state transmission systems and its ability to acquire resources in other market areas, it will be able to acquire power cheaper than its customers could individually, and that it can achieve savings overall from economies of scale. Plaintiffs are not entitled to be relieved of any cost increases associated with this 102 MW any more than they are entitled to lower rates, or rates which exclude purchased power costs.[50]

■ Finally, WAPA is not required to give primary consideration to the power needs of irrigators in the allocation of project power, or to afford preference to the irrigators. The preference clause in section 9(c) requires only that public entities be given preference over private entities in the marketing of power from federal reclamation projects; it does not require that all preference customers be treated equally or that all preference customers

47. Plaintiffs, in fact, state that they do not object to WAPA's expanding the CVP load *per se,* provided that the CVP rate structure does not force existing customers to share the substantial expense of such expansion.

48. Of the total amount of energy available for disposition through the CVP during fiscal years 1977–1982, 43.6% was purchased power and 56.4% was project generated power. Plaintiffs' Statement of Material Facts No. 12.

49. For example, in 1964 Congress specifically authorized the CVP to purchase an additional 400 MW of power from the Pacific Northwest for the benefit of certain load growth customers. This power is imported into California over the Pacific Northwest—Pacific Southwest Intertie, a series of extra high voltage transmission lines built jointly by the federal government and a number of private utilities.

50. The contracts that each of the plaintiffs has with WAPA for the purchase of CVP power expressly provide that the power being sold to them includes power purchased from nonproject sources. The contracts further provide that this power is surplus power and may be withdrawn at any time to satisfy project needs.

even receive an allocation. The allocation of power among the various preference customers is the type of decision that is committed to agency discretion. In fact, WAPA's decision to allocate the 102 MW is totally unreviewable because there is simply "no law to apply." *City of Santa Clara v. Andrus, supra,* 572 F.2d at 667–68.[51]

### VI

 One of the purposes of the Reclamation Project Act was to provide a method by which the United States may recover its construction costs on reclamation projects. The sale of power from such projects was considered an important source of revenues to defray the substantial costs incurred by the government, including those costs associated with the project's irrigation functions. Congress included the provision granting certain public entities a preference in the sale of project power to benefit a wide class of users and to ensure that private entities would not purchase all the inexpensive power and resell it at a profit.

All of the parties agree that irrigation is an important function of the CVP. However, the reclamation laws which govern the marketing of power from the CVP do not require that irrigators be given any special or greater preference than other preference customers. To require all such commercial customers to share in the costs of project power is clearly permitted by the statute and it is not inconsistent with the statutory goals or the intent of Congress. Accordingly, the motions for summary judgment filed by the government and the intervenor-defendants will be granted.

---

**51.** See also *Electricities of North Carolina, Inc. v. Southeastern Power Administration,* No. 82–888–CIV.5 (E.D.N.C. October 16, 1984), slip op. at 6–9 (decision of SEPA with respect to the allocation of federal hydroelectric power among preference customers is committed to SEPA's discretion under the Administrative Procedure Act and is not subject to judicial review).